**UNITED STATES DISTRICT COURT**        **EASTERN DISTRICT OF TEXAS**

UNITED STATES OF AMERICA            §
                                    §
*versus*                            §        CASE NO. 9:18-CR-41(1)
                                    §
DMARCUS JAMIL JILES                 §

### MEMORANDUM AND ORDER

Pending before the court is Defendant DMarcus Jiles's ("Jiles") *pro se* Motion for Compassionate Relief (#70) construed as a Motion for Compassionate Release, filed on August 16, 2022. Jiles previously submitted a *pro se* request for Compassionate Relief (#63) seeking home confinement, which the court denied by a Memorandum and Order signed June 28, 2022 (#68). The Government filed a Response in opposition to Jiles's Motion for Compassionate Release and submitted medical records (#72). United States Probation and Pretrial Services ("Probation") conducted an investigation and recommends that the motion be denied. Having considered the motion, the Government's response, Probation's report, the record, and the applicable law, the court is of the opinion that the motion should be denied.

I.    Background

On November 14, 2018, a grand jury in the Eastern District of Texas returned a seven-count Indictment charging Jiles with a variety of offenses. He was charged in Counts One, Two, and Three with Bank Robbery, in violation of 18 U.S.C. § 2113; in Counts Four and Six with Use, Carrying, and Possession of Firearms and Ammunition During and in Furtherance of a Violent Crime, in violation of 18 U.S.C. § 924(c); in Count Five with Hobbs Act Robbery, in violation of 18 U.S.C. § 1951; and in Count Seven with Bank Robbery, Attempt, in violation of 18 U.S.C. § 2113. On July 30, 2019, Jiles pleaded guilty before Magistrate Judge Zack Hawthorn

to Counts One, Two, Three, Five, Six, and Seven pursuant to a binding plea agreement.  On August 20, 2019, United States District Judge Ron Clark adopted the magistrate judge's report and recommendation and found Jiles guilty of the subject offenses.  On March 17, 2020, Judge Clark sentenced Jiles to a total term of imprisonment of 252 months, consisting of 168 months on each of Counts One, Two, Three, Five, and Seven, to be served concurrently, and 84 months on Count Six, to be served consecutively to the other counts, followed by a 5-year term of supervised release.  Jiles filed a direct appeal on March 26, 2020, which the United States Court of Appeals for the Fifth Circuit dismissed as frivolous on October 26, 2020.  Jiles is currently housed at United States Penitentiary Victorville ("USP Victorville"), located in Victorville, California.  His projected release date is June 7, 2036.

II.   Analysis

On December 21, 2018, former President Trump signed the First Step Act of 2018 into law.  *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.  The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> (A) the court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

>> (i) extraordinary and compelling reasons warrant such a reduction; or

>> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the

offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A). This provision is commonly referred to as "compassionate release." *See, e.g.*, *United States v. Escajeda*, 58 F.4th 184, 186 (5th Cir. 2023) ("We often refer to this as 'compassionate release' because courts generally use it for prisoners with severe medical exigencies or infirmities.").

A.   Exhaustion of Administrative Remedies

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release. *United States v. Jackson*, 27 F.4th 1088, 1089 (5th Cir. 2022); *see United States v. Franco*, 973 F.3d 465, 467 (5th Cir.) ("Prior to the passage of the First Step Act . . . courts lacked the power to adjudicate motions for compassionate release."), *cert. denied*, 141 S. Ct. 920 (2020); *Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP). The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf. *Jackson*, 27 F.4th at 1089; *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019). The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement. 18 U.S.C. § 3582(c)(1)(A); *United States v. Garrett*, 15

F.4th 335, 337 (5th Cir. 2021) ("[T]o file a proper motion for compassionate release in the district court, a prisoner must first exhaust the available administrative avenues."); *Franco*, 973 F.3d at 467 (holding that the statutory requirement that a defendant file a request with the BOP before filing a motion for compassionate release in federal court "is *not* jurisdictional but that it *is* mandatory"); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release.").

Thus, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request.  18 U.S.C. § 3582(c)(1)(A); *Garrett*, 15 F.4th at 338 ("[A]n inmate has two routes by which he may exhaust his administrative remedies.  Both begin with 'requesting that the [BOP] bring a motion on the defendant's behalf.'" (quoting *Franco*, 973 F.3d at 467)); *United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020); *United States v. Springer*, 820 F. App'x 788, 791 (10th Cir. 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies" (citing *Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020))).

4

Here, attached to the Government's Response is a copy of a request Jiles submitted to Warden Lammar on May 3, 2022, the warden of the facility where he was housed at the time, seeking compassionate release.  There is no indication, however, that the warden ever provided a written response to Jiles's request.  Hence, it appears that Jiles has met the statutory requirements for exhaustion, as he filed his motion for compassionate release on August 26, 2022, well past the 30-day waiting period.  *See Garrett*, 15 F.4th at 338 ("[A] prisoner may wait 30 days after filing his request and—whether the BOP has ruled on the request or not—he is free to file a motion in the district court.").  The Government concedes that Jiles has satisfied the administrative exhaustion requirement.  Nonetheless, although Jiles complied with the exhaustion requirement before filing his motion for compassionate release, nothing in the motion indicates that extraordinary and compelling reasons exist to release him from confinement.

B.   Criteria for Release

The United States Court of Appeals for the Fifth Circuit has held that when a defendant moves for compassionate release, he must satisfy three criteria.  *United States v. Rollins*, 53 F.4th 353, 358 (5th Cir. 2022) ("[A] prisoner seeking compassionate release must overcome three hurdles." (quoting *Jackson*, 27 F.4th at 1089)); *United States v. Shkambi*, 993 F.3d 388, 392 (5th Cir. 2021).  First, he must meet one of two conditions listed in § 3582(c)(1)(A)—either the defendant has extraordinary and compelling reasons that warrant a reduction under 18 U.S.C. § 3582(c)(1)(A)(i) or the defendant is at least 70 years of age, has served at least 30 years in prison, and meets the additional requirements of 18 U.S.C. § 3582(c)(1)(A)(ii).  *Shkambi*, 993 F.3d at 391; *see Rollins*, 53 F.4th at 358.  Second, the defendant "must show that compassionate release is consistent with the applicable policy statements from the [United States Sentencing

Commission ("Commission")]." *Shkambi*, 993 F.3d at 392; *accord Rollins*, 53 F.4th at 358. Third, the defendant "must convince the district judge to exercise discretion to grant the motion after considering the § 3553(a) factors."[1] *Shkambi*, 993 F.3d at 392; *accord Rollins*, 53 F.4th at 358; *United States v. Keys*, 846 F. App'x 275, 276 (5th Cir.), *cert. denied*, 142 S. Ct. 299 (2021); *United States v. Cooper*, 996 F.3d 283, 287 (5th Cir. 2021).

Section 3582(c)(1)(A)(i) does not define the "extraordinary and compelling reasons" that may merit compassionate release. Rather, Congress elected to delegate its authority to the Commission. *See* 28 U.S.C. § 994(t) (directing the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *Jackson*, 27 F.4th at 1090; *Cooper*, 996 F.3d at 287; *Shkambi*, 993 F.3d at 392. Prior to the passage of the First Step Act, the Commission issued a policy statement set forth in U.S.S.G. § 1B1.13, which, along with its commentary, describes the reasons that qualify as extraordinary and compelling.[2] However, § 1B1.13 references only

---

[1] Section 3553(a) directs courts to consider:  the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable United States Sentencing Guideline ("U.S.S.G.") provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim.  18 U.S.C. § 3553(a).

[2] In Application Note 1 to § 1B1.13 of the U.S.S.G., the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances:  (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason.  U.S.S.G. § 1B1.13 cmt. n.1.

motions filed by "the Director of the [BOP]"—not an individual defendant.[3]  Consequently, the Fifth Circuit has held that when a defendant files a motion for compassionate release on his own behalf, the Commission's policy statement set forth in § 1B1.13 is not applicable because that policy statement governs only motions filed by the Director of the BOP.  *See Jackson*, 27 F.4th at 1090; *Cooper*, 996 F.3d at 287-88; *Shkambi*, 993 F.3d at 392.

Nevertheless, while recognizing that they are not binding, the court views the Commission's policy statement contained in § 1B1.13 and the commentary thereto as providing guidance regarding the types of reasons that may be deemed sufficiently "extraordinary and compelling" to warrant compassionate release.  *See United States v. Thompson*, 984 F.3d 431, 433 (5th Cir.) ("Although not dispositive, the commentary to § 1B1.13 informs [the court's] analysis as to what reasons may be sufficiently 'extraordinary and compelling' to merit compassionate release."), *cert. denied*, 141 S. Ct. 2688 (2021); *United States v. Rivas*, 833 F. App'x 556, 558 (5th Cir. 2020) (upholding denial of compassionate release and recognizing that the court was guided in its analysis by the commentary to U.S.S.G. § 1B1.13).  A review of dictionary definitions also sheds light on the meaning of these terms.  *See Escajeda*, 58 F.4th at 186.  The word "extraordinary" is defined as "going beyond what is usual, regular, or customary . . . exceptional to a very marked extent," whereas the word "compelling" is defined as "forceful . . . demanding attention . . . convincing."  *Extraordinary*, MERRIAM-WEBSTER'S COLLEGIATE

---

[3] U.S.S.G. § 1B1.13 was last amended on November 1, 2018.  Until recently, the Commission has been unable to amend § 1B1.13 to incorporate the changes wrought by the First Step Act due to the lack of a quorum.  The Commission consists of seven voting members and, per statute, requires four members for a quorum to amend the guidelines.  28 U.S.C. §§ 991(a), 994(a).  On August 4, 2022, the United States Senate confirmed seven new members to the Commission.  Although the Commission now has a quorum for the first time in over three years, it has not promulgated any additional policy statements or amendments to the guidelines.

DICTIONARY (11th ed. 2007); *Compelling*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2007); *see Escajeda*, 58 F.4th at 186; *United States v. Mitchell*, No. 15-20609, 2021 WL 1827202, at *2 (E.D. Mich. May 7, 2021).  "Courts have interpreted 'extraordinary' in the context of compassionate release as 'beyond what is usual, customary, regular, or common,' and a 'compelling reason' as 'one so great that irreparable harm or injustice would result if the relief is not granted.'" *Mitchell*, 2021 WL 1827202, at *2 (quoting *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at *5 (E.D. Mich. May 15, 2020); *United States v. Sapp*, No. 14-20520, 2020 WL 515935, at *3 (E.D. Mich. Jan. 31, 2020)); *see Escajeda*, 58 F.4th at 186. "These terms explain why prisoners can seek relief under § 3582(c)(1) only when they face some extraordinarily severe exigency, not foreseeable at the time of sentencing, and unique to the life of the prisoner." *Escajeda*, 58 F.4th at 186 (citing *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020)).

      1.    <u>Medical Condition</u>

In his current motion, Jiles, age 37, contends that he is eligible for compassionate release due to his medical condition and mental health problems.  Jiles claims:

> I had reconstructive plastic surgery.  Since I've been in the B.O.P.  I have a metal plate in my face.  To hold my eye in socket.  It's very painful daily it's hard to handle.  My vision is blurry I see double.  I have very bad migraines daily.  Do [sic] to the trauma to the head area.  I can't remember things now.  An [sic] I can lose full vision if anything happens to me.  I have very bad anxiety and deppression [sic] as well.  I truly need to get out of prison.  So I can get the help I truly need.

Although not binding on the court, § 1B1.13 suggests that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious

functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).  Here, according to Jiles's Presentence Investigation Report ("PSR"), prepared on January 27, 2020, and revised on February 25, 2020, when interviewed by Probation, he reported no history of serious or chronic illnesses or medical conditions.  While in pretrial detention, medical records from LaSalle Correctional Facility indicate that he had been diagnosed with depression and bipolar disorder and was prescribed risperidone to treat these afflictions.

Jiles's BOP medical records generated on September 19, 2022, reveal that he has been diagnosed with anxiety disorder, adjustment disorders with depressed mood, hypermetropia (lazy eye), amblyopia (far sightedness), unspecified disorder of eye and adnexa, osteoarthritis of the knee unspecified, and a variety of dental problems.  A prior diagnosis of a major depressive disorder is listed as "in remission" and a previous head contusion and eye/orbit injury are described as "resolved."  Jiles's medical records reflect that he tested positive for COVID-19 on September 22, 2021, but had recovered by October 4, 2021, at which time John Fernon, NP, noted that "inmate is not severely immunocompromised and did not have a severe illness requiring hospitalization."  Jiles's medical records also contain an entry noting "Patient's noncompliance with other medical treatment and regimen."  Jiles is prescribed acetaminophen and ibuprofen for pain and osteoarthritis of the knee (for which he has also been issued a knee brace), amitriptyline for depression and nerve pain, and mirtazapine for depression (having been substituted for risperidone), and an ophthalmic solution for his eyes.  Jiles is currently classified as a BOP

Medical Care Level 2 inmate.  According to the BOP's Clinical Practice Guidance, dated May 2019, Care Level 2 inmates "are stable outpatients who require clinician evaluations monthly to every 6 months.  Their medical and mental health conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring.  Enhanced medical resources, such as consultation or evaluation by medical specialists, may be required from time to time."

Jiles's eye injury occurred as a result of a reported assault.  On November 29, 2021, Jiles was taken to the emergency room at Christus Health Southeast Texas in Beaumont, Texas, where he presented with left eye pain and facial swelling.  According to a nursing note, "Patient states that he was playing cards and he was hit in the head with an unknown object numerous times and his head was slammed into the table."   A CT scan taken that day revealed "[t]here is a fracture of the floor of the left orbit.  It is displaced inferiorly.  There is hemorrhage in the left maxillary sinus.  There is a fracture of the medial wall of the left maxillary sinus."  Jiles was subsequently transported to Memorial Hermann Hospital ("Memorial Hospital") in Houston, Texas, where he was examined on December 15, 2021, by Daniel Freet, M.D. ("Dr. Freet"), who evaluated his left orbital floor fracture and noted that Jiles had some blurriness of vision but did not have any double vision.  On January 24, 2022, Jiles had plastic surgery at Memorial Hospital to repair the fracture in a procedure described as "open reduction internal fixation left orbital floor fracture" and was discharged the next day.  A discharge summary authored by Shaina Wang Gong, M.D., states that Jiles tolerated the surgical procedure without complication and on the day of discharge, "patient's pain was well controlled," "[p]atient denies vision changes," and "EOM (extraocular movements) intact."   He was prescribed acetaminophen twice daily, amitriptyline by mouth at bedtime, and ibuprofen as needed.  At a follow-up appointment with Jiles on February 2, 2022,

Dr. Freet stated, "He has no complaints today.  He states that his vision is much better now.  He has some double vision still when he looks down/in downward gaze.  On exam his double vision has mostly improved since surgery."  Dr. Freet concluded, "His wounds are well healed.  He is doing well post operatively."  In a BOP medical record dated February 2, 2022, A. Lynd, NP, recorded that when Jiles returned from a post-operative trip to the plastic surgeon, he reported "They said everything is fine."

On May 27, 2022, after Jiles was transferred to USP Victorville and began to complain of eye pain, an x-ray confirmed that there was "[n]o acute fracture seen by radiographic exam. There is previous mesh wire fixation of the floor of the left orbit with healed left orbital floor fracture.  The mesh partially extends to the inferior aspect of the medical left orbital wall.  The hardware is intact.  Alignment appears satisfactory, near anatomic."  Jiles was issued a new pair of prescription glasses on June 10, 2022.  A vision screen conducted on January 24, 2019, reveals that Jiles has experienced poor vision since well before the assault in 2021.  According to a clinical encounter dated May 27, 2022, Saroj Gulani, M.D., noted that although Jiles complained of pain, "he [was] doing well with Ibuprofen."

Jiles's mental health problems first came to the attention of the court when his counsel moved for a psychiatric evaluation and a sanity evaluation pursuant to 18 U.S.C. §§ 4241 and 4242 on January 4, 2019, after he was arrested in this case on July 10, 2018.  Jiles was evaluated at the Federal Detention Center in Houston by a licensed psychologist, Tennille Warren-Phillips, Psy. D. ("Dr. Warren-Phillips"), who submitted a report dated May 7, 2019.  She obtained prior mental health records for Jiles from the Harris County Sheriff's Office, dated January 2017 to November 2018; the Angelina County Sheriff's Office, dated July 2018 to October 2018; Burke

Center-Lufkin, dated July and August 2018; and Cypress Creek Hospital ("Cypress Creek"), dated August 9, 2018, to August 21, 2018.  Dr. Warren-Phillips also conducted clinical interviews of Jiles on January 16, 2019, February 9, 2019, March 1, 2019, March 6, 2019, and March 15, 2019.  The records from the Harris County Sheriff's Office indicate that Jiles complained of anxiety and insomnia but denied any symptoms of psychosis.  When held at the Angelina County Jail for the pending charges in this case, he stated that he had not taken his antidepressant or antipsychotic medication in five months and reported a habit of using methamphetamine, marijuana, and cocaine daily.  He was later assessed by the Burke Center on several occasions due to reported auditory hallucinations commanding him to kill himself.  He was referred to the Burke Center on July 15, 2018, following his reported experience of auditory hallucinations and suicidal ideation.  The Angelina County Jail staff again referred Jiles to the Burke Center on August 7, 2018, due to his agitation, threats of self-harm, and suicidal ideation.  Because he was classified by jail staff as "very dangerous," their own emergency services were deemed inadequate and he was referred to Cypress Creek where he was admitted in August 2018.

At Cypress Creek, Jiles initially presented with auditory, visual, and tactile hallucinations; depressive symptoms; anxiety; and suicidal ideation.  His thought processes were notable for tangential and circumstantial speech with derailment, his attention was attentive, and he had an intact memory, an irritable mood, and a cooperative attitude.  His initial psychiatric examination resulted in a diagnosis of Bipolar Disorder, Current Episode Mixed, Severe, with Psychotic Features.  Records from Cypress Creek reveal that "Jiles frequently asked to stay at the hospital during consults with the Psychiatrist.  He advised them he did not want to return to prison because it is not good for him and requested long-term placement in a mental health institution instead.

He made this known during nearly every single consult with the treating Psychiatrist.  Despite his requests for long-term psychiatric care, he often refused to participate in treatment activities and stayed in his room."  Over time, Jiles's psychotic symptoms were described as being less frequent and intense, and his mood improved.  By the time of discharge, his reported hallucinations and suicidal ideation had resolved, and his mood was improved.

When interviewed by Dr. Warren-Phillips, however, Jiles recalled that the medications prescribed while hospitalized at Cypress Creek in 2018 were only marginally effective.  He claimed that he continued to hear voices at the time of discharge and indicated that his symptoms worsened (auditory hallucinations and poor sleep).  Dr. Warren-Phillips noted that this was contradictory to what the psychiatrist documented in the discharge summary.  Jiles acknowledged, however, requesting an opportunity to stay at the hospital or somewhere else long-term.  He also related that after his return to jail, he asked to return to the hospital so he could acquire extensive treatment.

Dr. Warren-Phillips stated that at the time of her evaluation, Jiles described experiencing symptoms of command auditory hallucinations; mood swings; poor memory; distress and depression about his symptoms; irritability; and being easily angered.  He characterized his mood as shifting from one minute to the next, with the longest swing of mood lasting a full day.  He did not identify what triggered a bad mood.  Jiles indicated that his longest depressive period extended for a week and was accompanied by auditory hallucinations and anxiety.  He recalled that he sometimes felt happy for a few days, but those instances overlapped with drug use.  Dr. Warren-Phillips stated that a thorough review of his reported episodes of happiness and improved

13

energy revealed they were inconsistent with a manic or hypomanic episode, the core feature of Bipolar Disorder.

While at the Federal Detention Center, Jiles was prescribed Citalopram for his reported symptoms of depression, but he later complained it gave him headaches and it was discontinued in January 2019.  The following month, the antidepressant Zoloft was prescribed for the remainder of his stay.

A sample of the phone calls and emails Jiles made from the detention facility were also reviewed.  In these communications, according to Dr. Warren-Phillips, "[h]e showed no signs of cognitive impairment or mental illness.  He was focused, organized, and able to give instructions to family about how to visit.  Jiles was resourceful asking a peer for information about a new visiting schedule; and discussed budgeting his money for commissary and telephone."

During evaluation sessions, Jiles's mood was typically recorded as being depressed.  At times, he avoided eye contact.  His memory processes were notable for him being a poor historian; in fact, at times, it seemed his alleged memory impairment was exaggerated.  In contrast to his consistently depressed presentation when he was with Dr. Warren-Phillips, Jiles was observed behaving quite differently by correctional officers.  Staff reported that Jiles played dominos with peers, was animated and boisterous, socialized regularly, and appeared to be enjoying himself.  Staff observed no deficits in his communication or memory.  He rarely appeared sad or solemn and was "always smiling, showing off his grill."  Dr. Warren-Phillips recounted an occasion in the housing unit, when he was likely unaware of her presence, in which she observed Jiles's demeanor to be pleasant and not depressed.  However, when he exited the housing unit, under her

escort, "his affect instantly changed to sad." Similarly, she observed his "adoption of a disingenuous approach to testing suggest[s] a cognitive ability that is not significantly impaired."

During a structured interview of reported symptoms, Dr. Warren-Phillips evaluated Jiles for the presence of feigned psychiatric symptoms. During the interview, Jiles's "affect was incredibly and consistently restricted. He looked very tense and emotionally detached. He was nonverbal for many of his responses, offering nods to communicate his answers. He showed annoyance with the length of the test and asked to discontinue it towards the end." Dr. Warren-Phillips reported that:

> Mr. Jiles' responses yielded a profile that produced five primary scales in the Probably Feigning range while three markedly elevated scores were in the Definite Feigning category. Five scores in the Probably Feigning range is considered a robust finding and reflects a very strong likelihood Mr. Jiles is feigning psychological symptoms, rather than responding honestly. Furthermore, a single elevation in the Definite Feigning category is a significant finding, characteristic of feigned symptoms of mental illness and rarely seen in individuals responding truthfully. In this case, Mr. Jiles' responses have produced three elevations in Definite Feigning range. The SIRS-2 results were considered consistent with test results observed on other malingering tools administered to him, observations for marked discrepancies in his presentation, and yielded a robust finding his psychiatric symptoms were most likely feigned.

> Dr. Warren-Phillips ultimately diagnosed Jiles with the following:

> Malingering
> Cannabis Use Disorder, Severe
> Alcohol Use Disorder, Severe
> Stimulant Use Disorder-Amphetamine Type, Mild
> Antisocial Personality Order, traits

She opines that "the current clinical picture for Mr. Jiles is clouded by overt indication of Malingering." She explains that in the current context, "Malingering is defined as the gross exaggeration or fabrication of psychological symptoms in order to avoid a legal consequence. Malingering is considered relatively common in criminal forensic examinations. The finding of

Malingering is supported by test scores which were consistent with feigning and exaggeration."

She continued, "[t]he level of impairment Mr. Jiles attempted to endorse on these measures is

directly contradicted by his unimpaired functioning observed at this facility and reportedly in the

community."

Dr. Warren-Phillips further commented:

Mr. Jiles's motivation to avoid incarceration was consistently noted in the hospital
records. His reported psychiatric difficulty at this facility was contrasted by
normal functioning when he was not in the presence of this Evaluator. It is entirely
possible, and this Evaluator opines likely, Mr. Jiles exaggerated his reported
psychological symptoms not only while at the Angelina County Jail and Cypress
Creek Hospital, but during the course of this evaluation. His primary motivation
is likely avoiding incarceration and the potential consequences of the pending
charges. The data strongly supports the conclusion that Mr. Jiles does not
currently have a genuine severe mental illness.

In sum, Jiles's "overall presentation emphasizes the likelihood the likely motivation is for leniency

in court."

At a health screen at the BOP in Beaumont on July 22, 2020, Jiles's mental health was

assessed as follows:

Level of Consciousness: Alert and Oriented
Psychomotor Activity: Normal
General Appearance: Normal
Behavior: Cooperative
Mood: Appropriate to Content
Thought Process: Goal Directed
Thought Content: Normal
Hx of Mental Health Treatment: Inpatient > 3 times
Hx of Head Injury: None
Current Mental Health Treatment: No
Current Mental Health Complaint: No
Hx of Loss of Consciousness: No
Hx of Hearing Voices: No
Past History of Suicide Attempt: No
Current Suicide Ideation: No
Suicide Prevention Initiated: No

Jiles was prescribed both risperidone and amitriptyline.  The court notes that contrary to his previous records where he complained of experiencing auditory hallucinations, Jiles denied that he had a history of hearing voices.

At a psychiatric evaluation performed on October 19, 2020, by Caralyn Floyd, D.O. ("Dr. Floyd"), Jiles reported that he had been "doing OK except the lockdown increases his anxiety and depression.  Appetite has been fair.  Sleep has been fair."  He further stated that his anxiety is "really bad" and that he needs Elavil for it.  He was informed that he was already on Elavil (amitriptyline).  Jiles "then stated that his mood was mostly stable, somewhat depressed.  Reports hearing a voice every now and then, but he is able to distract and it does not bother him.  Denies VH (visual hallucinations) or paranoia.  He is trying to cope with his sentence, PRD (projected release date) of 2036, and is hoping to get a reduced sentence."  Jiles also reported two prior suicide attempts, which he had not mentioned before, where he purportedly cut himself on the wrist.  Dr. Floyd described his mood as "stable, somewhat depressed," assessed that he had an "adjustment disorder with depressed mood," and discontinued his prescription for risperidone.  On September 14, 2021, Jiles complained of AH (auditory hallucinations) and sleeping problems to the nurse.  Dr. Floyd, however, discharged Jiles from the Psychology Clinic and told him that he was not getting sleeping medication.  She described his mood as otherwise stable.  Dr. Floyd also referred to Jiles's documented history of Malingering (feigning symptoms).  She added that he can be re-referred if Psychology deems his AH (auditory hallucinations) are legitimate.

Upon Jiles's arrival at USP Victorville, he was evaluated by Dr. Gulani on May 27, 2022, who reported that Jiles had a history of depression and anxiety disorder and was taking 100 mg of Elavil (amitriptyline) each day.  Jiles, however, told Dr. Gulani that the medication was "not

helping him at all," he gets "severe anxiety disorder, also mood swings, is unable to sleep, and only sleeps a few hours." Jiles denied hallucinations, delusions, or suicidal or homicidal thoughts. Dr. Gulani added mirtazapine as a medication for Jiles. He assessed Jiles as having adjustment disorders with depressed mood and anxiety disorder but found that his previously diagnosed major depressive disorder was in remission.

Yet, in his pending motion, filed August 16, 2022, Jiles returns to his prior themes of exaggerating, over-dramatizing, and feigning the extent of his medical woes. He elaborates:

> I suffer daily with my problems. It's very stressful and painful. I ask to see medical here at Victorville USP. An [sic] I never get seen only once. I told them about the metal plate and migraines. They only gave me Tylenol and Ibuprofen. I told them it doesn't work at all. I can't even sleep do [sic] to the pain. They told me it's nothing else they can do. I can't even get seen about my mental health. My situation is only getting worser [sic]. I'm scared I might go blind. My vision is getting worser by the day. My anxiety and depression is through the roof. I truly need to get out of prison.

He attempts once again to further his goals of obtaining leniency from the court and avoiding incarceration by these disingenuous declarations. Yet, in this instance, his efforts are unavailing. Similar to the prisoner in *United States v. Wymer*, Jiles's "contentions are overblown and unrealistic." 573 F. Supp. 3d 1208, 1210 (N.D. Ohio 2021). Simply put, in this situation, Jiles's mere anxiety and unfounded apprehensions about his continued incarceration do not warrant compassionate release. *See id.* at 1212.

None of Jiles's medical or mental conditions are terminal or substantially diminish his ability to provide self-care, nor do they otherwise present extraordinary and compelling reasons justifying compassionate release. *See Thompson*, 984 F.3d at 433. To the contrary, Jiles's conditions are managed by monitoring, testing, treatment, medication, and medical equipment. *See id.* His medical records reveal that he has regular chronic care visits and follow-ups to

18

address his medical and mental health concerns.  Moreover, Jiles is capable of providing self-care in the institutional setting and is not limited in his activities of daily living.  He is housed in general population, has no work restrictions, and is cleared for food service.

Thus, Jiles has failed to establish the existence of any medical or mental problems that would constitute extraordinary and compelling reasons to reduce his sentence and release him from prison.

### 2.     Family Circumstances

Jiles also contends that his family circumstances present extraordinary and compelling reasons that justify compassionate release because he is needed as a caregiver for his mother, grandmother, and daughter.  He claims that his mother requires his assistance due to her suffering three strokes that rendered her unable to talk.  He further asserts that his grandmother is "up in age."  In addition, Jiles maintains that he has an autistic daughter who needs special attention on a regular basis.  Jiles, however, provides no medical records or other documentation supporting these contentions.  He also does not identify which of his six daughters is autistic or detail how her mother is unable to care for her.

As explained above, although the court is not bound by § 1B1.13 or the commentary thereto, the court views the commentary as informative of its analysis as to what reasons may be sufficiently extraordinary and compelling to merit compassionate release.  *See Shkambi*, 993 F.3d at 392; *see also Thompson*, 984 F.3d at 433; *Rivas*, 833 F. App'x at 558.  The U.S.S.G. acknowledge that extraordinary and compelling reasons may exist with respect to a defendant's family circumstances, under the following conditions:  (i) "[t]he death or incapacitation of the caregiver of the defendant's minor child or minor children" or (ii) "[t]he incapacitation of the

19

defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner." U.S.S.G. § 1B1.13 cmt. n.1(C)(i)-(ii).

While the U.S.S.G. do not provide a definition of "incapacitation," "[f]or guidance [on what constitutes] 'incapacitation,' courts look to the BOP's non-binding Program Statement for processing compassionate release requests." *United States v. White*, No. CR16-40, 2021 WL 1721016, at *4 (E.D. La. Apr. 30, 2021); *United States v. Bolden*, No. 16-320, 2020 WL 4286820, at *4 (W.D. Wash. July 27, 2020) (consulting the BOP's relevant Program Statement for guidance); *United States v. Doolittle*, No. 19-501, 2020 WL 4188160, at *2 (D.N.J. July 21, 2020) (same); *United States v. Collins*, No. 15-10188, 2020 WL 136859, at *4 n.13 (D. Kan. Jan. 13, 2020) (noting that although the Program Statement is specifically meant for use by the BOP, it "provide[s] guidance for courts as well"). BOP Program Statement number 5050.50, entitled Compassionate Release/Reduction in Sentence:  Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), defines incapacitation of an inmate's spouse or registered partner as:

> Suffered a serious injury, or a debilitating physical illness and the result of the injury or illness is that the spouse or registered partner is completely disabled, meaning that the spouse or registered partner cannot carry on any self-care and is totally confined to a bed or chair; or
>
> A severe cognitive deficit (e.g., Alzheimer's disease or traumatic brain injury that has severely affected the spouse's or registered partner's mental capacity or function), but may not be confined to a bed or chair.
>
> For these requests, the inmate should demonstrate that the inmate is the only available caregiver for the spouse or registered partner, meaning there is no other family member or adequate care option that is able to provide primary care for the spouse or registered partner.

U.S. DEP'T OF JUST., FED. BUREAU OF PRISONS, PROGRAM STATEMENT 5050.50 (Jan. 17, 2019); *Collins*, 2020 WL 136859, at *4.

Here, according to Jiles's PSR, he is not married, and he does not claim that he has a spouse or registered partner who is incapacitated.  He also does not assert that any of the caregivers of his minor children are deceased, incapacitated, or unable to care for his children. BOP Program Statement number 5050.50, entitled Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), defines incapacitation of a family member caregiver as:  "[A] family member caregiver [who] suffered a severe injury (*e.g.*, auto accident) or suffers from a severe illness (*e.g.*, cancer) that renders the caregiver incapable of caring for the child."  U.S. DEP'T OF JUST., FED. BUREAU OF PRISONS, PROGRAM STATEMENT 5050.50 (Jan. 17, 2019); *White*, 2021 WL 1721016, at *4.  Absent from Jiles's documentation is any indication that the mother of any of his six daughters suffers from a serious injury or debilitating physical illness that renders her completely disabled, or that she suffers from a severe cognitive deficit. *See Bolden*, 2020 WL 4286820, at *5 ("Defendant has failed to demonstrate that his spouse is incapacitated to the extent that she cannot carry on any self-care and is totally confined to a chair or bed.").

Therefore, Jiles cannot claim he is the only available caregiver for his autistic daughter. *See United States v. Jackson,* No. CR 6:17-73-HMH, 2020 WL 6110998, at *2 (D.S.C. Oct. 16, 2020) (denying compassionate release for family circumstances where the caregiver of defendant's minor children passed away but the children were being cared for by a relative); *see also United States v. Silverlight*, No. 4:12-CR-201-YGR, 2021 WL 1736864, at *3 (N.D. Cal. May 3, 2021) (holding that defendant's arguments for "release to care for members of her family including her minor children do not rise to the level of 'extraordinary and compelling' circumstances warranting reduction of her sentence"); *White*, 2021 WL 1721016, at *4 (denying compassionate release

despite defendant's daughter being under his sole legal custody because defendant failed to demonstrate that his daughter's current caregiver, his mother, whom he claimed was battling cancer, was incapacitated); *United States v. Williamson*, No. 1:06-CR-474-1, 2021 WL 309067, at *5 (M.D.N.C. Jan. 29, 2021) ("It is commendable that [the defendant's] family's wellbeing is forefront in his mind and that it may deter him from future criminal conduct. However, their welfare was an insufficient deterrent at the time of the instant offense, and it is not the Court's obligation to lessen the burden that [the defendant] placed on them in the first place."), *aff'd*, No. 21-7151, 2022 WL 227511 (4th Cir. Jan. 25, 2022); *United States v. Bowyer*, No. 16-96, 2020 WL 5942195, at *2 (E.D. La. Oct. 7, 2020) (denying compassionate release because the defendant did not allege that the mother of his child was the only available caregiver); *United States v. Ellis*, No. 15-124, 2020 WL 5073562, at *3 (E.D. La. Aug. 26, 2020) (denying compassionate release despite a showing that the mother and caregiver of the defendant's child suffered from multiple illnesses because the defendant had failed to demonstrate that those illnesses incapacitated the caregiver).

In this instance, Jiles's desire to care for his mother and grandmother also does not constitute an extraordinary and compelling reason warranting compassionate release. *See United States v. Phillips*, No. 13-286, 2021 WL 4476819, at *4 (E.D. La. Sept. 30, 2021) (finding defendant's family circumstances did not merit compassionate release and rejecting the notion that the situation was extraordinary and compelling where he claimed his elderly parents were both battling cancer and had no one to care for them); *United States v. McMurray*, No. 3:12-cr-00360-HZ-1, 2021 WL 4473403, at *2 (D. Or. Sept. 29, 2021) (denying compassionate release for defendant to care for his mother who suffered from debilitating mental and physical health

22

conditions, was unable to care for herself, lived with significant pain, and other family members could offer only limited support due to their jobs and other commitments); *United States v. Cephus*, No. 2:09 CR 43, 2021 WL 3884829, at *2-3 (N.D. Ind. Aug. 31, 2021) (joining a number of other district courts who were not persuaded that caring for elderly or ill parents constitutes an extraordinary and compelling reason warranting compassionate release and finding that defendant's "aging and sick mother" who had undergone quadruple bypass surgery, suffered from coronary artery disease, and had frequent heart palpitations was not an "extraordinary" circumstance); *United States v. Goldberg*, No. CR 12-180 (BAH), 2020 WL 1853298, at *4 (D.D.C. Apr. 13, 2020) (noting that a desire to care for one's elderly parents does not constitute an extraordinary and compelling reason because "[m]any, if not all inmates, have aging and sick parents." (quoting *United States v. Ingram*, No. 2:14-cr-40, 2019 WL 3162305, at *2 (S.D. Ohio July 16, 2019))).  Like the defendant in *McMurray*, Jiles "committed a serious offense that carried a significant sentence.  A consequence of that sentence is not being available to support family members as he desires."  2021 WL 4473403, at *2.

Moreover, Jiles has not demonstrated that he is the only available caregiver for his mother and grandmother.  *See Phillips*, 2021 WL 4476819, at *4 (denying compassionate release and remarking that defendant had provided no evidence that he was the only person who could care for his parents where the record reflected that at one time he had several siblings in the area); *United States v. Shabazz*, Crim. Action No. 17-43 (JDB), 2021 WL 4306129, at *3 (D.D.C. Sept. 22, 2021) (denying compassionate release where the defendant had not shown that he was the only available caregiver for his elderly mother, that his release was the only option for his mother's care, or that his situation was so rare as to qualify as "extraordinary"); *United States v. Crandle*,

23

No. 10-35, 2020 WL 2188865, at *4 (M.D. La. May 6, 2020) (denying request for relief and noting that "the court has before it no information as to why other relatives cannot care for [the defendant's] parents"). In this instance, according to Jiles's PSR, he has a step-father who is about 51 years old, as well as a maternal half-brother and a daughter who are adults located in the area. Hence, Jiles's family circumstances do not amount to extraordinary and compelling reasons for his early release from prison.

It is well settled that "compassionate release is discretionary, not mandatory." *Chambliss*, 948 F.3d at 693. In exercising its discretion, the court finds that Jiles has failed to establish that his medical or mental health condition or his family circumstances constitute extraordinary and compelling reasons to reduce his sentence and release him from prison at this time.

C.     Section 3553(a) Factors

In addition, the court finds that compassionate release is not merited in light of the applicable factors set forth in 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A) (requiring courts to consider the § 3553(a) factors before granting compassionate release); *United States v. Shorter*, 850 F. App'x 327, 328 (5th Cir. 2021) (finding that the court did not abuse its discretion in denying compassionate release after balancing the § 3553(a) factors); *Keys*, 846 F. App'x at 276; *Shkambi*, 993 F.3d at 392; *Thompson*, 984 F.3d at 435 n.11 (collecting cases); *Chambliss*, 948 F.3d at 693-94. Jiles's offenses of conviction stem from his commission of a series of armed bank robberies in small towns in Texas in 2018.

On April 13, 2018, Jiles entered the Commercial Bank of Texas in Diboll, Texas, and inquired about opening an account. He was wearing clothing that partially covered his face, so the teller asked him to remove it. He then took a handgun from his pocket and demanded the

24

teller give him all the money in her drawer, threatening to shoot her if she did not.  Jiles left the

bank with $13,566.50 in U.S. currency.  On the same day, Jiles also entered two other banks in

nearby Lufkin, Texas, but left both banks without demanding money.  On April 20, 2018, Jiles

entered BBVA Compass Bank in Broaddus, Texas, wearing a camouflage jacket covering his face

and asked a teller about opening an account.  When the teller asked him to uncover his face, Jiles

took a handgun from his pants and demanded "big bills" from the teller's drawer.  He then

instructed the teller to open the bank's vault and give him all the money or he would kill her.  He

also threatened to kill everyone in the bank.  Jiles took the money from the vault and left the bank

with $101,662.50 in U.S. currency.  On May 25, 2018, Jiles entered BancorpSouth Bank in Alto,

Texas, wearing dark gloves, sunglasses, and a mask that covered his face.  He approached a teller

and asked about opening an account.  He then brandished a handgun, demanded money, and

threatened to kill the teller.  He demanded the money from two teller drawers.  He subsequently

ordered the two tellers to the vault area and demanded that one of them open the vault.  The teller

was able to open the vault after two failed attempts, and Jiles orderd her to fill his duffel bag with

the money from the vault.  Jiles left the bank with $176,014 in U.S. currency.

On July 4, 2018, Jiles entered the Hampton Inn in Livingston, Texas, and asked the desk

clerk about vacancies.  He then pointed a firearm at the clerk and demanded money.  After

obtaining money from the front desk drawer, he demanded money from the safe.  The clerk,

however, was unable to open the safe, so Jiles left the hotel with $133 in U.S. currency.  On July

10, 2018, Jiles approached Commercial Bank of Texas in Kennard, Texas, wearing a camouflage

bandana across his face, a hat, and gloves, while carrying a rolled-up bag.  A bank employee,

however, saw him approaching the bank and locked the door.  When Jiles tried to enter, the

employee told him to go to the bank's drive-through window.  Jiles then left the area.  Employees reported the attempted robbery with a description of Jiles's vehicle.  After Jiles fled, a state trooper eventually located the vehicle and conducted a traffic stop.  Jiles was found to be driving without a license and was arrested.  Law enforcement subsequently recovered a .40 caliber pistol with a magazine and ammunition from a truck located at Jiles's residence.

Jiles has an extensive criminal history beginning at age 17, which includes prior convictions for theft of property (2x), unauthorized use of a vehicle (2x), possession of marijuana (3x), burglary of a habitation, failure to identify to a police officer, evading arrest or detention, criminal trespass, assault causing bodily injury to a family member, trespass of property or building with no forcible entry, possession of a controlled substance (MDMA), and driving without a license.  Jiles also failed to comply with prior terms of probation.  In *United States v. Boyd*, the defendant had a similar history of violating probation.  No. 3:17-CR-37-TAV-DCP-4, 2021 WL 5094903, at *3 (E.D. Tenn. Nov. 2, 2021).  The court found that "defendant's history of violating probation calls into question his respect for the law and whether he would abide by his conditions of supervised release in this case if his motion for compassionate release were granted."  *Id*.  This court shares the same concerns in reference to Jiles.  Moreover, his PSR indicates that Jiles accumulated 19 criminal history points, 6 points above the 13 points necessary to be placed in the highest criminal history category.  Jiles also has a long history of poly-substance abuse beginning at age 15, including the daily or frequent use of alcohol, marijuana, Xanax, Ecstasy, and methamphetamine.  In short, Jiles's "criminal history and conduct reflect an unabated propensity for crime."  *United States v. Padilla*, No. H-14-174-1, 2021 WL 1517855, at *5 (S.D. Tex. Apr. 16, 2021).

"Compassionate release is discretionary, not mandatory, and [may] be refused after weighing the sentencing factors of 18 U.S.C. § 3553(a)." *Chambliss*, 948 F.3d at 693; *Rollins*, 53 F.4th at 358-60 (upholding the denial of compassionate release of the defendant, who suffered from a "dire" medical situation stemming from a gunshot wound that required the amputation of his right leg and left him paralyzed, and deferring to the district court's balancing of the § 3553(a) factors, including the defendant's "history, the serious nature of his offense, and the danger his release would pose to the community at-large"); *United States v. Gharib*, No. 21-40779, 2022 WL 1565352, at *1 (5th Cir. May 18, 2022).  Where, as here, a prisoner has engaged in "severe" criminal conduct and has a long criminal history, the district court has discretion to deny compassionate release under the circumstances.  *Chambliss*, 948 F.3d at 693-94; *accord Rollins*, 53 F.4th at 358-60; *Gharib*, 2022 WL 1565352, at *1 (refusing to consider the defendant's contention that extraordinary and compelling reasons justified compassionate release due to the defendant's no longer being subject to the career offender enhancement when the district court found that the § 3553(a) factors outweighed granting relief); *Keys*, 846 F. App'x at 276 (rejecting Defendant's argument that the court gave too much weight to his criminal history and finding that "a mere disagreement with the court's balancing of the § 3553(a) factors . . . is not a sufficient ground for reversal").

In addition, granting Jiles compassionate release would fail to provide just punishment for his offenses and promote respect for the law.  In *Chambliss*, the Fifth Circuit upheld the denial of compassionate release due to the defendant's not yet having served a sufficient portion of his sentence.  948 F.3d at 694.  The district court determined that the defendant's terminal illness "constitut[ed] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did]

not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense." *Id.* at 693-94. "Moreover, the [district] court, citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'" *Id.*; *see Rollins*, 53 F.4th at 359-60; *Thompson*, 984 F.3d at 434-35 (observing that the courts that have granted compassionate release "largely have done so for defendants who had already served the lion's share of their sentences and presented multiple, severe, health concerns"); *accord Rodriguez*, 27 F.4th at 1100. In the instant case, releasing Jiles after he has served only 5 years of his 21-year sentence would similarly minimize the impact of his crimes and the seriousness of his offenses as well as fall short of providing just punishment and adequate deterrence to criminal conduct.

In view of the nature and circumstances of his offenses of conviction, his extensive criminal history, his failure to comply with prior terms of release on probation, and his long history of substance abuse, the court cannot conclude that Jiles's early release from prison would afford adequate deterrence or protect the public, as he continues to pose a danger to other persons and to the community as a whole. As the court noted in *United States v. Preston*, "[t]he best predictor of how [Defendant] will behave if he were to be released is how he behaved in the past, and his track record is a poor one." No. 3:18-CR-307-K, 2020 WL 1819888, at *4 (N.D. Tex. Apr. 11, 2020) (quoting *United States v. Martin*, 447 F. Supp. 3d 399, 403 (D. Md. 2020)). Here, Jiles's track record is similarly a poor one. There is no reason to believe that Jiles would not revert to engaging in acts of violence involving firearms, committing robberies, perpetrating

28

thefts, and continuing his poly-substance abuse if released from prison at this time.  *See Wymer*, 573 F. Supp. 3d at 1212.

III.   Conclusion

In sum, Jiles has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere.  The 252-month sentence of imprisonment imposed upon Jiles for his offenses of conviction comports with the 18 U.S.C. § 3553(a) factors, and he has adduced no extraordinary and compelling reasons to lessen his sentence or release him from prison at this juncture.  Neither his medical condition, his mental health, the quality of medical care he is receiving, nor his family circumstances merit a reduction of his sentence in this situation.

For the foregoing reasons, Jiles's *pro se* Motion for Compassionate Relief (#70) construed as a Motion for Compassionate Release is DENIED.

SIGNED at Beaumont, Texas, this 1st day of May, 2023.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE